# THE FREDERICK-TOWN SAVINGS INSTITUTION *vs.* JOHN L. MICHAEL.

*Insolvency—Discharge of Surety on Note by Acceptance of Mortgage and New Note—Preferences—Liability of Married Woman Signing Joint Note with her Husband.*

The plaintiff bank was the holder of promissory notes for money loaned to W. upon which the defendant was liable as surety. In response to plaintiff's demand for the renewal, with additional security, of the notes, some of which, including the one sued on in this case, were overdue, W. gave to the plaintiff bank the joint note of himself and wife for the principal sum of his entire indebtedness, and executed a mortgage to the bank of his real estate to secure the payment thereof, in which his wife united ; and thereupon the former notes were delivered by the plaintiff to W. The bank knew at the time that W. had failed to pay his debts at maturity. Within four months after this transaction W. applied for the benefit of the insolvent law, and upon a bill filed by his trustee in insolvency, the mortgage from W. and wife to the plaintiff was vacated and annulled, as being a preference under the insolvent law, and it was decreed that the original promissory notes should 'be returned to the plaintiff bank. This action was instituted on one of them against W. and the defendant, and the latter pleaded payment and satisfaction. *Held*,

1st. That since the plaintiff had voluntarily accepted the note and mortgage of W. and his wife in lieu of the note sued on, and with knowledge of W's. precarious financial condition, the liability of the defendant as surety was extinguished.

2nd. That although the mortgage was vacated as a fraudulent preference under the insolvent law, yet the note secured by it remained valid, and the liability of W's. wife as joint maker thereof was unaffected.

A married woman may become surety on a note executed by her jointly with her husband, and in such case it is not necessary, in order to hold her liable, that the consideration of the contract should enure to her benefit.

Appeal from a *pro forma* judgment of the Circuit Court for Frederick County. This was an action of *assumpsit* by the appellant against the appellee and Wm. Wilcoxon, sur-

viving makers of the following promissory note: "Fred-
erick, Md., Aug. 4, '92.   Six months after date, we jointly
and severally promise to pay to the order of the Frederick-
Town Savings Institution, five thousand dollars, for value
received, negotiable and payable at the Frederick-Town
Savings Institution."   (Signed), Wm. Wilcoxon, Andrew J.
Wilcoxon, Jno. L. Michael.   The defendant, Michael, filed
the general issue plea and a special plea, "that before this
action Wm. Wilcoxon, who was the principal maker of said
note, satisfied and discharged the plaintiff's claim by pay-
ment."   This plea was traversed by the plaintiff and issue
joined.   Judgment by default was entered against Wilcoxon,
subject to his discharge in insolvency.

The evidence showed that in March, 1893, W. Wilcoxon,
a merchant and trader, was indebted to the appellant bank
in the sum of $11,300, upon four promissory notes, two of
which were not then due, and the other two, including the
note sued on in this case, were overdue.   On March 16,
1893, he was notified by the bank that the overdue notes
must be renewed with additional security before the 23rd
of that month, this notice being a repetition of a previous
demand for renewal with additional security.   On March
21, 1893, Wilcoxon gave to the bank the joint note of
himself and wife for the said sum of $11,300, payable. six
months after date, and executed a mortgage to the bank of
certain real estate owned by him to secure the payment of
the same.   At the same time Wilcoxon was credited in his
account with the plaintiff bank with $11,300, the face of the
new note, and with a check for $227.64, drawn on another
bank.   The sum of $115.86 was on that day the balance
to the credit of Wilcoxon on the books of the plaintiff.   He
at once gave his check, payable to the plaintiff, against these
credits, for $11,643.50, which sum represented the aggre-
gate amount of the four promissory notes, both due and
unmatured, six months interest in advance, at five per cent.,
on the mortgage debt, and accrued interest on the overdue
notes.   This check closed and exactly balanced his account
current with the plaintiff.

The old notes thus taken up, including the one which is the cause of action in this case, were then delivered to Wilcoxon. At the time of this transaction it was agreed between Wilcoxon and the bank that the money loaned on said mortgage note was to be applied solely to the payment of his indebtedness to the bank.

On May 6, 1893, within four months after the execution of said mortgage, Wilcoxon applied for the benefit of the insolvent law of the State of Maryland. On the 24th of the same month his trustees in insolvency filed a bill in equity against the Savings Institution and Wilcoxon and his wife, setting forth the above transaction and alleging that at the time of the execution of the said note and mortgage for $11,300, and for a long period prior thereto, the said Wilcoxon was a merchant, manufacturer and trader, and was insolvent, and so continued up to the time of filing his application for the benefit of the insolvent laws of Maryland; that at the time of the execution of the said note and mortgage no money was *bona fide* loaned or paid by the Savings Institution to Wilcoxon, but the consideration of the same was wholly debts before that time owing to the Savings Institution, and said note, and mortgage which was given to secure said note, were intended for no other purpose than to pay and secure to be paid the said four notes; that accordingly, immediately upon the execution and delivery of said note and mortgage for $11,300, and upon the receipt of the cash paid by said Wilcoxon, the Savings Institution delivered up to Wilcoxon the said four notes, which were then in the possession of the trustees in insolvency; that the mortgage given to secure the payment of said note for $11,300 and the lien thereby created was a preference in favor of said Savings Institution over other creditors of Wilcoxon, and that the same was void under the laws of Maryland. (Code, Art. 47, sec. 14, as amended by the Act of 1890, ch. 364.)

Upon this bill the Circuit Court for Frederick County, in Equity, decreed that the said mortgage executed by Wilcoxon and wife to the Savings Institution be set aside

and declared null by reason of its being a preference prohibited by the insolvent laws of Maryland; that the said Savings Institution should pay to the trustees in insolvency the sum of $343.50, less the sum of $115.86, and that the Clerk of the Court should deliver to the Savings Institution the four promissory notes above mentioned.  It was subsequently decreed in another equity case, between the same parties, that the dower interest of the wife of Wilcoxon in the land mortgaged by him and her to the Savings Institution did not pass to the mortgagee, but remained in her.  No appeal was taken from the decrees, and on September 20, 1894, this action was institued.

At the trial the first exception was taken to the refusal of the Court, *pro forma*, to admit in evidence the bill in equity filed by the trustees in insolvency, the answer of the Savings Institution, and the opinion and decree of the Court thereon.  The second exception was taken to a similar ruling of the Court, refusing to admit evidence by the plaintiff showing that in obedience to the decree in said cause in equity, the said note for $5,000, the cause of action in this case, was delivered back to the plaintiff, and that plaintiff paid to the trustees in insolvency of Wilcoxon the sum of $227.64.   The third exception was taken to the *pro forma* ruling of the Court, that under the pleadings and evidence the verdict must be for the defendant.

The cause was argued at January Term, 1895, before ROBINSON, C. J., BRYAN, McSHERRY, BRISCOE, PAGE and ROBERTS, JJ., and was subsequently, under an order of the Court, re-argued at April Term, 1895, on notes filed by counsel.

*Charles W. Ross* and *John S. Newman* for the appellant.

If the contention of the appellee is correct, that is, if the contract in this case is valid so as to release the sureties on the original notes, and is such simply because the note of Wilcoxon and wife has not been declared void, then the ap-

pellant will be adjudged to have accepted said note in pay-
ment when the same does not bear interest, and no interest
has been paid on it; for the very money which was paid as
interest, in the shape of discount, has been recovered back
by the trustees of Wilcoxon, in insolvency.

This we consider a very important circumstance in this
case.   Surely the appellant never agreed to accept a note
for the sum of eleven thousand three hundred dollars, pay-
able six months after date, in payment of the original in-
debtedness, and make the principal a present of the interest.
Is it not, therefore, true that when the appellant was de-
creed to refund the interest, that avoided that portion of the
contract, the same as setting aside the mortgage avoided the
other portion?   Is not the appellant, the bank, therefore
entitled to be restored to its former position.

So strongly did this transaction impress the Circuit Court
for Frederick County, that in its opinion indicating the equity
case, it said: " Those original notes *uncancelled and unpaid*
are here in Court.   The sureties on them *have not been
prejudiced or injured* (as far as the record discloses) by the
execution and delivery of the mortgage, as the mortgage
must fall by reason of the inexorable mandate of the statute;
though there is no taint or suggestion of fraud in the con-
duct of the bank, it is only *just and equitable* that the bank
should be restored to the position which it held when the
mortgage was given, March, 1893.   This will injure no one.
Should the sureties be obliged to pay the notes they will
merely discharge the obligation they voluntarily assumed
when they signed them.   Whatever loss may fall upon them
will be a loss resulting from their own contract and not from
any conduct of the bank."

But is the note for the sum of eleven thousand three hun-
dred dollars, executed by William Wilcoxon, with Eliza-
beth Wilcoxon as surety, according to the contention of
appellee, a valid note or contract?   For to constitute a
novation, the new contract must be a valid one.   In every
novation there are four essential requisites: First, a previous

valid obligation ; second, the agreement of all the parties to
the new contract; third, the extinguishment of the old con-
tract ; fourth, *the validity of the new one.    Clark* v. *Billings,*
59 Ind. 508 ; *Am. & Eng. Ency. of Law,* vol. 16 (Nova-
tion), pg. 864, and cases there cited.    Where there is a
substitution of a new contract for an old one, the new con-
tract must be a valid one, upon which the creditor can have
his remedy.    *Guichard* v. *Brande,* 57 Wis. 534 ; *Sprycher*
v. *Werner,* 74 Wis. 456.

In addition, then, to the matters hereinbefore referred to,
in considering the validity of the note for $11,300 made by
Wilcoxon and wife, it becomes necessary to consider the
validity of the undertaking of Elizabeth Wilcoxon, for if she
is not bound under her contract as surety, the note is not
" one upon which the creditor can have his remedy."
What then was her contract?    Was it not that she signed
the note as surety on the condition that the same would be
secured by a conveyance to the appellant of certain property
by way of mortgage?    This, we submit, was her undertak-
ing, an undertaking of which the payee and appellant at the
time had knowledge.

A surety who has contracted to become so on the under-
standing that he is to be co-surety with another, is wholly
released if the intended co-surety does not execute.    *Evans*
v. *Blenridge,* 8 DeG. M. & G. 100.    If, then, the liability of
Elizabeth Wilcoxon was assumed with the full knowledge
and understanding on the part of the payee (the appellant
bank) and of Wilcoxon, the principal maker, that the
said note of William Wilcoxon for the sum of eleven thou-
sand three hundred dollars would be secured by a mort-
gage conveying certain property, which conveyance would
result to her benefit as surety on said note (because it is
a well settled principle of law, that any security taken by
the principal would revert or belong to the surety on pay-
ment of the debt thereby secured by the surety), and this
very conveyance of property, which was given to secure this
debt, was rendered null and void by operation of law and

such security thereby lost, would not Elizabeth Wilcoxon, under such circumstances, be discharged from liability, and could the bank maintain an action against her as surety? The inducement for her to become surety on said note having been rendered utterly null and void, how can it be said that she is still liable on the note? If, then, no action can be maintained against her upon the ground that her contract of suretyship has been violated, how can it be successfully maintained that the said note is a novation of the original indebtedness. The appellant therefore insists that Elizabeth Wilcoxon is not bound by her contract of suretyship on the said note.

*J. C. Motter* and *William P. Maulsby, Jr.*, for the appellee.

At the time the transaction occurred, who doubted but that the note had been fully paid and satisfied, absolutely and unqualifiedly extinguished without further life or vitality. If Michael, the appellee, had gone to the appellant after the 21st day of March, 1893, and asked for the note in question, it would have been promptly explained to him that the note had been paid and delivered up to Wilcoxon; that he was no longer responsible to the appellant on said note, and he would have gone thence with the comforting assurance that he was forever relieved of that heavy financial responsibility. Our brothers contend that it would have been a mere delusion, however. If the new note, as an actual fact, was discounted (the appellant says it was), and a part of the proceeds of that note were applied to the payment of the note in question, and the old note was delivered up as paid (which is admitted by the appellant), it is fully discharged and forever extinguished as against the appellee, and the plea of payment is sustained. *Bank of New Windsor* v. *Ecker, Executor*, 59 Md. 304–5; *U. S.* v. *Thompson*, 33 Md. 575; *Compton* v. *Patterson*, 28 South Carolina, 115.

If there was a valid binding contract made between appellant and Wilcoxon or his wife on March 21st, 1893, the day of extension of note and mortgage for $11,300, then the

surety, Michael, appellee, was discharged, and the judgment must be affirmed, because such a contract was a variance from the contract appellee made with appellant when he became surety on $5,000 note, and a variance made without appellee's consent.    Appellee had a right to have the letter of his contract with appellant as surety on $5,000 note observed ; a departure from this contract discharged him.    31 Md. 131 ; 47 Md. 190 ; 9 Wheaton, 680.

The appellant knew that Wilcoxon was a trader and merchant ; he kept his account as such with appellant ; the proceeds of this $5,000 note, when originally discounted for him, had gone into this very account, as also the other notes, the sum of which made up the indebtedness of $11,300—besides which he carried on business openly and publicly as a merchant and trader in the very town of appellant, having a store within two blocks of appellant's bank.    We submit that it knew Wilcoxon was insolvent at date of mortgage, by its own dealings with him. *Knew it*, not suspected or had good reason to believe, but knew it.

Now, with this knowledge of law and fact, what was the contract made March 21st, 1893 ? · We, appellant, will loan you $11,300, the exact amount owing us by you, upon your giving us two securities, the one your wife as a security on the note ; we know you are a trader, that you are insolvent, that the mortgage creates a preference, that this preference is in fraud of insolvent law, that if insolvent proceedings are had in four months, this preference will be set aside, but we equally know, that if no proceedings are had within four months, it will remain good.    It is perfectly valid and binding now, and we will take the risk of it remaining good.    We get a present lien, we get the chance of it remaining unassailed.    This chance we take, this con tingency we accept.    We submit that this is the fair statement of the contract with the conditions expressed in language which were in law and fact necessarily implied in the contract of March 21st.    The mortgage was then made valid

and binding. It would remain so, unless a contingency happened, viz., unless proceedings in insolvency were had within four months. Whether this contingency would or would not happen, was the risk or chance the appellant took—the chance that it would not happen. " If parties make contracts upon contingencies equally uncertain to both of them, or with equal means of information, upon what grounds can Courts undertake to set them aside ? "

But in another view, independently of the foregoing, the contract of March 21st, 1893, extended the time for the payment of the $5,000 note, superseded the contract made by appellee as surety on this note, by the mortgage of March 21st, and thus discharged the surety. Any extension of time of payment by creditor by valid contract with principal debtor, by which the rights of surety during the time thus extended are suspended, discharges the surety. 64 New York, 457. Of course the reason is plain ; anything which prevents the right of surety to protect himself, done by creditor, violates the contract made between creditor and surety and discharges surety. " Any dealings with the principal debtor by the creditor, which amount to a departure from the contract by which the surety is to be bound and which by possibility might materially vary or enlarge the latter's liability without his assent, discharges the surety." *Mayhew* v. *Boyd*, 5 Md. 102.

And if we are wrong in this contention that the mortgage conveyed the potential dower right of Mrs. Wilcoxon, which was a sufficient consideration for the contract for the 6 months extension given in mortgage, if we are wrong in all this, we submit that, besides and outside the mortgage the appellant received in the contract of March 21st full consideration to support the contract; that the same was a valid and binding one ; and if so, that the surety, appellee, was discharged. What did appellant receive ? He got two securities for his debt ; the one the liability of Mrs. Wilcoxon, the other the mortgage. These were the very securities he asked, with the taking of which

appellee had nothing to do ; one of the securities, the mort-
gage, upon the hypothesis of this view, fails, is void .from
the beginning, but the other one, Mrs. Wilcoxon, is not
void. She remains liable ; the appellant has a note for
$11,3000 with one security who is bound. Can this be
denied ? Surely the note is not a preference ; the note is
but the sum of the old debt. So far as the creditors of
insolvent are concerned, they are no worse off for the $11,300
note than before it was made, the preference has been avoided,
viz., the mortgage, but the note is in full force. Mrs. Wil-
coxon is not asking to be relieved from the note ; the appel-
lant, who took her as the surety, asks it ; but why ? upon
what ground ? She was not a necessary party to the note,
even though a desirable one to the mortgage, yet they took
her. She was and is for any reason that we have heard
suggested bound by her position as surety on the note.
There has been no bill filed by the trustees in insolvency
asking to have note declared null. So far as the law goes,
we submit the note is in full force and vigor, a legal, binding
obligation.

ROBERTS, J., delivered the opinion of the Court.

The record of this appeal contains three exceptions, two
of which relate to the admissibility of the proof offered, and
one to the rulings of the Court below in rejecting the prayers
of the plaintiff, and granting that of the defendant. The
questions are interesting and important, not only on account
of the large sum involved, as of the principles of law invoked,
and which we are now called upon to consider and apply.
This is an action brought upon a promissory note in the
Circuit Court for Frederick County. The note sued upon
is as follows :

$5,000.00.             " FREDERICK, MD., Aug. 4th, 1892.

Six months after date we jointly and severally promise to
pay to the order of the Frederick-Town Savings Institution,
five thousand dollars for value received, negotiable and pay-
able at the Frederick-Town Savings Institution. Wm. Wil-
coxon, Andrew J. Wilcoxon, John L. Michael."

The principal question in the case arises on the issue taken on the replication to the second plea.   The plea states that William Wilcoxon, the principal in said note, satisfied and discharged the same by payment before suit brought thereon.   It is not, however, a technical question of pleading which we are called upon to decide.   The material inquiry is, did said Wilcoxon satisfy and discharge said note by payment *in such manner* as to relieve the appellee, Michael, from further liability as surety thereon.   This is the plain issue presented and which we are now to determine.   The facts shown by the record, touching the question of payment pleaded by the appellee, are that the appellant bank was, on the 21st of March, 1893, the holder of four notes of said Wilcoxon and sureties variously dated, and for various sums, and which together aggregated the sum of $11,300.   The note sued on was one of the four making up said last mentioned sum.   Being thus indebted and repeatedly pressed by the appellant for additional security to that then held by it, Wilcoxon and wife agreed to give to the appellant their note for the sum of $11,300.00, secured by mortgage on his real estate.   This offer was accepted by the appellant without qualification or condition. The mortgage was thereupon executed and delivered to the appellant, and the new note then discounted by it.   From the proceeds of the said new note the indebtedness of said Wilcoxon, evidenced by said four notes, was paid and the same were then delivered by the appellant to said Wilcoxon. Within four months after the execution of said mortgage Wilcoxon applied for the benefit of the insolvent law of the State of Maryland, and was adjudged to be insolvent. Trustees having been selected, under the provisions of the law, they filed, with the sanction of the Court, a bill in equity, to set aside said mortgage, as giving to the appellant a fraudulent preference under the provisions of the insolvent laws.   Wilcoxon being a merchant or trader, and found to be insolvent at the time of the execution and delivery of the mortgage, the Court decreed it to be an unlawful pref-

erence and struck down the same.   An important question arises here as to the effect resulting from depriving said mortgage of its character as a legal preference.   It is contended by the appellant that the action of the Court in the insolvency proceedings not only deprived said mortgage of its quality as a lien or preference in the distribution of the assets of the insolvent estate of Wilcoxon, but that such action extinguished the *liability of the surety* in said note, for the payment of which the mortgage was given to secure. We have been referred to many cases touching the liability of sureties as to what constitutes payment and what does not, and we fully concur in the doctrine announced thereon. This, however, is not a case where in the renewal of a note the signature of the surety has been subsequently ascertained to be a forgery.   In such a case, the renewal is invalid, and does not operate as a payment of the original note ; nor does it effect an extinguishment of the right of action thereon.   This is the almost universal concession of the declared doctrine of the Courts in England and in this country.   There is, however, but small analogy between the case of a forged signature to a note and the case now under consideration.   In the one instance, as far as the surety is concerned, the note is a nullity ; in the other, which is the case now before us, we have a mortgage given to secure a perfectly valid note, but in consequence of the provisions of the insolvent law, the mortgage is not allowed to stand as a legal preference in the appellant's favor in the distribution of the assets of the insolvent estate, *only, however, because* it has been executed and recorded within the inhibited period contained in the statute.   This view of the law in no sense contravenes the doctrine of the cases of *Goodrich* v. *Trucy,* 43 Vt. 314 ; *Markle* v. *Hatfield,* 2 Johns. 455 ; *Eagle Bank* v. *Smith,* 5 Conn. 71.

This case was, by agreement of counsel, tried before the Court below without the intervention of a jury.   The facts contained in the record are fully and satisfactorily stated by the reporter in his notes placed at the head of

this case. The first exception taken by the appellant relates to the admissibility in evidence of the record of proceedings in equity cause No. 6128, on the docket of the Circuit Court for Frederick County, to which the appellee was not a party, and in no wise concluded from making in this action any defense which he had the legal right to interpose. This exception brings up for consideration the primary and leading question on this appeal: Has the appellee, by the action of Wilcoxon, been discharged of liability as surety on the note sued upon?

It will be necessary to consider, in the first place, the legal attributes of the joint note of Wilcoxon and wife for the sum of $11,300, which the appellant discounted for the purpose of paying the four notes of Wilcoxon and sureties, at the time held by the appellant, and which were delivered to Wilcoxon when the note of himself and wife had passed to the possession of the appellant. We may have occasion later on to examine some of the consequences attending the execution of the mortgage. But let us inquire as to the legal status of the note of Wilcoxon and wife, after the mortgage had been declared an illegal and fraudulent preference. It was not a necessary incident to the execution of a valid mortgage, that a note of any kind should have been given. The mortgage would have been equally valid without it, and if given, it was only collateral to the note, and the wife was in no sense a necessary party to the note. The almost universal practice in this State has been for the wife to join with her husband in the execution of the mortgage, for the *sole* purpose of releasing and conveying her potential right of dower; but to the accomplishment of this purpose it was in no respect essential that she should join in the making of the note. Since the passage of the Act of 1872, ch. 270, (Code, Art. 45, sec. 2), by which the wife is authorized jointly with her husband to contract in writing on any note, bill of exchange, &c., there is a manifest object to be obtained in having the wife join in the note as well as the mortgage, especially if she be seized or possessed of property.

As already stated, the appellant was urging upon Wilcoxon to give *additional security* for the notes which were already in the possession of the bank, and yet, as soon as the new note and mortgage were delivered to the bank, it voluntarily surrendered to Wilcoxon the four notes on which he was originally indebted.

Is it not a reasonable inference that the appellant was sufficiently well satisfied with the character of the new security which it had taken in payment of the original indebtedness of Wilcoxon on said four notes as to cause it, of its own motion, and not otherwise, to part with the possession of the four notes by delivering up the same to Wilcoxon, so that the new note and mortgage were in no just sense additional security? But there is another suggestive fact in the record which the testimony makes clear, and that is, the appellant cannot, under the circumstances of the case, justly claim to have been without notice of the financial status of Wilcoxon, and his liability to be declared an insolvent within four months of the execution of the mortgage. The appellant had in its possession at that time, four notes, covering an indebtedness of $11,300, and each of said notes was for money borrowed by Wilcoxon during the year 1892. These notes, or most of them, had been renewed from time to time and were long past due, yet Wilcoxon had not, to the 21st of March, 1893, the date of said mortgage, paid one farthing in discharge of the principal sums constituting his indebtedness on said notes. The doctrine is well recognized that insolvency may be inferred from the circumstances surrounding a transaction. If the appellant knew that Wilcoxon was a trader and indebted to it in the sum of $11,300, and that he had for nearly two years failed to pay his notes at maturity, in the ordinary course of business, and further knew that he had, within four months of the execution of the mortgage, suspended payment of his negotiable paper, and had failed to resume payment thereof within twenty days thereafter, did not these circumstances constitute reasonable cause from which the bank was justi-

fied in believing that Wilcoxon's business credit and pe-
cuniary standing were bad, and such as would warrant the
belief on the part of the bank that if it accepted a mort-
gage from him to secure itself, he would be liable to be
proceeded against under the provisions of the insolvent
laws ?   If with knowledge of the facts recited, and we can-
not escape the conviction based upon the testimony in the
record, that the appellant had such knowledge, it then
delivered up the four original notes to Wilcoxon, the ap-
pellant has taken a venture, the consequences of which it
must accept.   We are, after careful consideration, unable to
lend our sanction to the theory advanced, that in striking
down the mortgage as a fraudulent preference under our
insolvent laws, the note, which the mortgage was given to
secure, must also abide the same result.   We do not think,
upon principle or authority, that any such conclusion fol-
lows from the premises stated.   In *Allers* v. *Forbes,* 59 Md.
376, which was an action brought by Forbes against Allers.
and wife to recover on three promisory notes signed by
them as joint makers, the husband pleaded in his own
behalf, that he had been discharged under the insolvent
laws, and for a further plea the defendant and wife pleaded
" that by the discharge of the husband, they were jointly and
severally discharged from all liability on account of said
notes."   JUDGE MILLER, delivering the opinion of this Court,
said : " We can discover no possible reason why the dis-
charge of her husband under the insolvent laws should re-
lease her and her property.   Her property does not pass to
his trustee, nor are her rights therein in any way affected by
his insolvency.   The statute makes her stand, with respect
to the obligations so signed by her, in the same position as
any other party so signing them would stand."   The same
conclusion was reached by VICE CHANCELLOR HALL on a
similar state of facts in construing the English married
woman's property Act of 1870, in the case of *Davies* v.
*Jenkins,* L. R., 6 Chancery Division, 728.   We have referred
o these cases with but one purpose in view, and that is to

ascertain the legal status of the wife, as affected by her husband's insolvency, in a case like the present, where she has jointly with her husband executed a note.

There is nothing in the record to show whether Mrs. Wilcoxon is possessed of property or not, and there can be no just reason assigned why the appellant should be deprived of its indisputable right to proceed against her. If it had been the intention of the parties to controvert the responsibility of Mrs. Wilcoxon as surety on said note, it was their privilege to have done so at the trial below. But this they did not do, and without indulging in speculation as to her financial ability or looking to the consequences, as they may affect either party to this cause, we must apply the law as we find it. It is well-established law in this State, that a married woman is competent to become surety on a note which she has signed jointly with her husband, and it is wholly immaterial whether she has separate property or not. In some of the States where the laws relating to married women have undergone changes of like character with our own, there have been well-considered decisions of the Courts of those States holding *femmes covert* liable to the same extent announced by this Court. It has been argued that the note is void as against the wife, because there is no consideration to bind. her. A different view is, however, taken by CHIEF JUSTICE GRAY, who delivered the opinion of the Court in *Major* v. *Holmes*, 124 Mass. 108. He says: "Before the statute of 1874, ch. 184, the female defendant would not have been liable in either of those cases, because contracts could only be made by a married woman in reference to her separate property, business or earnings. But this statute has removed that restriction and in the broadest terms enables a married woman to make contracts, oral and written, sealed and unsealed, in the same manner as if she were *sole*, and does not require that the consideration of her contracts should enure to her own benefit." We have given careful examination and consideration to the questions presented by this appeal,

and finding no error in the rulings of the Court below, we must affirm the same.

*Judgment affirmed with costs.*

(Decided June 19th, 1895.)

McSHERRY, J., delivered the following dissenting opinion, in which BRYAN and BRISCOE, JJ., concur:

In March, 1893, Wilcoxon was indebted to the Frederick-Town Savings Institution in the sum of eleven thousand three hundred dollars on four promissory notes, of which two were overdue and two had not yet matured. There were sureties upon each of these notes. . Failing, after considerable pressure brought to bear by the bank, to give additional security, Wilcoxon finally agreed to execute and the bank consented to accept a mortgage upon Wilcoxon's real estate to secure the entire indebtedness. Accordingly, a new note for eleven thousand three hundred dollars, the total amount he owed the bank, and a mortgage of even date securing that note were executed by Wilcoxon and wife and delivered to the bank; the accrued interest and discount for six months in advance were paid and the bank returned to Wilcoxon the four promissory notes evidencing the original indebtedness. The precise mode pursued in accomplishing this arrangement was as follows: The note for eleven thousand three hundred dollars, signed by Wilcoxon and wife, was apparently discounted, and the proceeds were apparently carried to his credit in his account with the bank. Against this seeming, but not real credit, he drew his check for the face amount of the four notes, with accrued interest and discount in advance on the new note, and that check was then charged up against the fictitious credit simultaneously entered. No

actual money passed from the bank to Wilcoxon, or from
Wilcoxon to the bank, and none could have been drawn on
the faith of this alleged credit; but the whole transaction
was effected by a system of interledgering entries, intended
to create the impression that it was an entirely new discount,
disconnected from the antecedent indebtedness, and after
all the entries had been made nothing had been substantially
accomplished but the substitution of a new note, *and* a
mortgage for the four original notes.   Shortly after this
transaction had been completed, Wilcoxon, who was a
trader, made a voluntary application for the benefit of the
insolvent laws, and in due season his creditors elected per-
manent trustees, in the method prescribed by the Code.
The trustees, within four months after the date of the
mortgage, filed a bill in equity against the bank, alleging
that the mortgage was a prohibited preference, and praying
that it be cancelled and annulled.   After a hearing the
Circuit Court for Frederick County passed a decree va-
cating and setting aside the mortgage, upon the ground
that it was a preference given by a trader and accepted by
his creditor, contrary to the provisions of the insolvent law;
and it was further decreed that the four original promissory
notes on file in the office of the Clerk as a part of the evi-
dence in the then pending cause, be returned to the bank.
Thereafter the bank brought suit against Wilcoxon and
Michael upon one of the four promissory notes which con-
stituted the evidence of the original indebtedness to the
bank.   To the *narr*, which declared on a promissory note
for five thousand dollars, Michael in reality a surety, but
ostensibly one of the joint makers of the note, pleaded,
first, that he never promised as alleged; and secondly, that
before suit was brought Wilcoxon satisfied and discharged
the note by payment.   There are three bills of exception
in the record, and from the final judgment, which was
entered *pro forma* for the defendant, the bank has taken
this appeal.   The first exception was taken to the ruling
refusing to admit in evidence the bill, answer and decree in

the case instituted by the permanent trustees to annul the mortgage; the second was reserved because of the ruling refusing to allow the plaintiff to show that the note sued on had been delivered back to the bank by the Clerk pursuant to the decree, and the third was taken to the ruling of the Court upon the prayers—the prayer of the plaintiff, insisting that under the facts stated, it was entitled to recover, having been rejected and that of the defendant, being the direct converse, having been granted.

The question, then, which, it seems to me, lies at the very root of the controversy is, was there a payment of this note by Wilcoxon under the circumstances stated, and by the method above set forth?    If there was not, then clearly, under the issue joined on the second plea, the plaintiff was entitled to recover.    If there was a payment, then, of course, the debt was extinguished and the liability of Michael was at an end.

It must be borne in mind that the signatures to the note were not denied by the pleadings, and are, therefore, under Art. 75, sec. 23, sub-sec. 108 of the Code, admitted; and hence the mere production of the note made out a *prima facie* case which, unless rebutted, entitled the plaintiff to recover.    The defendant having pleaded payment and having thus set up new matter by way of defence had, according to settled rules of pleading and practice, the burden cast upon him to show affirmatively by evidence the truth of the facts asserted in the plea; and this included, as an integral part of the defence relied on, proof as to how and by what means the alleged payment had been made.    Payment cannot be proved without at the same time showing how it was made.    The method of payment is inseparable from the *fact* of payment, because the fact as to whether a payment has been made can only appear when the method by which it is alleged to have been made is disclosed.    Now, if under the circumstances stated there was a payment, how was it made? Was the debt evidenced by the five thousand dollar note sued on paid with money, or was it paid by the substitution

of another and a different obligation; that is to say, was there a novation? It is not pretended by any one that the note was paid with *money*—no suggestion of that kind is to be found in the record or was made in the argument at bar— and therefore if there was any payment at all it must have been and could only have been by a novation. If made by the latter means. then what was the obligation or new debt substituted for and accepted in lieu of and as discharging the original indebtedness? Was it the *note* of Wilcoxon and wife, with a collateral mortgage as a mere separable and divisible incident, or. was it the note of Wilcoxon and wife *and* a mortgage of even date securing it, both forming and intended to form one entire consideration? There is not the faintest intimation in the record to show that the bank and Wilcoxon agreed to substitute, or ever thought of considering, a new note of the debtor and his wife as a substantive payment of the four promissory notes, upon all of which there were personal securities. There can be no possible pretext that such an understanding or anything resembling it was proposed, much less accepted. There being nothing whatever in the record to show this, it cannot be assumed. The burden of proving such an agreement rests upon the defendant; the presumption of the law being that the note was taken as conditional payment only. *Haines & Eppley v. Pearce*, 41 Md. 221. There is consequently but one remaining contingency, and it is that the five thousand dollar note was paid, if paid at all, by the new note and the mortgage, both together constituting one entire novation, and not separate novations, of the original debt. To this complexion the contention must inevitably, by the simplest process of exclusion, ultimately come. If, then, the note *and* the mortgage together constituted the consideration for the surrender of the five thousand dollar note by the bank, and the mortgage has been stricken down because it was an unlawful preference, and therefore because it was such a mortgage as Wilcoxon could not lawfully give, and the bank has lost the benefit of the security the whole transaction

was intended to provide, has there still been a payment which extinguished the debt and satisfied the note signed by Michael? If it be conceded, as it must be, that both the note and the mortgage, by the agreement of the bank and Wilcoxon, made up and were to constitute a payment of the note sued on, then when one of these two constituent mediums of payment has proved valueless by reason of matters subsequently intervening but in reality existing at the date of, and inhering in, the mortgage, it is obvious that the other and remaining one cannot alone be treated as payment, unless the Court makes a new contract of novation for the parties that they did not see fit to make for themselves. This, of course, cannot be done. The bank was entitled to get and to retain all that it contracted for, not a mere fraction of it, before it can be held to the terms of its co-relative and dependent agreement to fully and finally surrender and extinguish the antecedent notes. This is so far fundamentally true as to be axiomatic and therefore incapable of demonstration. To constitute a novation which will discharge the original debtor and render a third person liable for the debt, there must be the substitution of a new obligation for the old one, and the new contract must be a valid one upon which the creditor can maintain his remedy. *Spycher* v. *Uerner*, 5 L. R. A. 414.

It is by no means an answer to say, that when the mortgage was taken the bank was bound to know that the lien created thereby would not prevail if attacked under the insolvent law, for the provisions of that law were as much an integral part of the mortgage as though they had been written at large therein. With those provisions, therefore, in the minds of the parties, as in contemplation of law they were in the body of the mortgage, it is not to be concluded, for there are no premises to justify it, that either the mortgagor or mortgagee contemplated the contingency would arise which would destroy the mortgage altogether; and hence, the only tenable inference is that both the bank and Wilcoxon supposed when the negotiations were made and

closed, that the mortgage was, and would continue to be, perfectly valid and effective, as it would undoubtedly have been had no insolvency proceedings intervened, and had no assault been made on it within the four months prescribed by the statute.   "Upon broad principles of justice, it would seem that a man should not be allowed to pay a debt with worthless paper, though both parties supposed it to be good." *Roberts* v. *Fisher*, 43 N. Y. 161.   And this doctrine runs through the differing phases of many adjudged cases.   Thus, in *Bemhisel* v. *Firman, Assignee*, 22 Wall. 170, where a security founded on a prior one was tainted with usury, and the prior one was free from it, but had been given up and cancelled in exchange for the tainted one, and the latter was thereafter adjudged void because of the usury, it was held that the prior or cancelled one was revived and could be enforced as though the invalid one had never been given. And the Court cites *Parker* v. *Cousins*, 2 Gratt. 389 ; *Bank* v. *Joslyn*, 37 N. Y. 353 ; *Cook* v. *Barnes*, 38 N. Y. 521 ; *Rice* v. *Welling*, 5 Wend. 595.   So where payments have been made in counterfeit money the debt has always been treated as still due and subsisting. *First Nat. Bk. of Athens* v. *Buchanan et al.*, 1 L. R. A. 199, and numerous cases cited in the note.   In *Petty* v. *Cook*, L. R. 6 Q. B. 790, the payee of a promissory note made by a principal and a surety accepted the amount thereof from the principal, in good faith, and without notice that the payment was a fraudulent preference.   The principal afterwards entered into a composition deed for the benefit of his creditors, the trustee under the deed avoided the payment as a fraudulent preference, and the payee returned the amount to the trustee. Then the payee brought suit against the surety on the note, and the surety pleaded, just as he has done in the case at bar, that the principal had satisfied and discharged the claim by payment.   But it was held by BLACKBURN, LUSH and HANNAN, JJ., that the payment did not operate as a satisfaction of the debt, and that the acceptance of the money from the principal by the payee was not an act done against

the faith of the contract with the surety so as to discharge him.    And in *Pritchard* v. *Hitchcock*, 6 M. & G. (46 E. C. L. R.) 151, it appeared that A had guaranteed the payment to B of two bills of exchange accepted by C.    C afterwards handed over the amount of the bills to B.    This was apparently a payment, and was intended to be, but a *fiat* having issued against C, his assignees in an action for money had and received recovered the money back from B as having been paid by way of fraudulent preference, just as the mortgage in the pending case was stricken down because it was a prohibited preference.    Then B, the creditor, brought suit against A, the guarantor, upon the guaranty, and A pleaded that C, the debtor, had paid, and B, the creditor, had received the money in satisfaction of the bills, which allegation was traversed by the replication.    It was held that the payment did not amount to a payment in satisfaction.    TINDAL, C. J., observed: "Of the fact of money being passed as a payment there can be no doubt, but I think that the plaintiff was at liberty to show that what appeared at the time to be a good and satisfactory payment, was perfectly illusory; that the money which he had received from W. Hitchcock could not be appropriated by him to his own use, but that it belonged to the assignees."    The two cases last cited differ from the one at bar only in the single fact that the payment pleaded was made with money, whilst here it was made with a note and mortgage.    In both *Pretty* v. *Cook* and *Pritchard* v. *Hitchcock*, the original evidences of indebtedness had been surrendered up upon the payments being made; the payments would have been good but for the intervening insolvency of the debtors, and the sureties were sued on the original contracts, after the money paid by the principal debtors had been recovered back by the assignees, because the payments, were, when made, fraudulent preferences.    Notwithstanding all this, the sureties were held not to have been discharged by these illusory payments.    Wherein is there the slighest difference in principle between those cases and the one at bar?

But without searching for merely parallel cases, which are valuable chiefly as illustrations of the application of established legal principles, what is the ultimate principle which underlies, and necessarily underlies, all adjudications of the class alluded to, wherein the surety bases his defence on the plea that the principal paid the debt, and the creditor insists that the payment was wholly illusory ? Obviously it is, that upon the failure of the alleged payment to become an effective and a real satisfaction of the debt, by reason of some supervening legal impediment, the debt remains unextinguished; and the attempted, but abortive payment, not being an act against the faith of the contract with the surety, in no way affects his liability, and consequently does not discharge him. The surety, at the time of taking upon himself his liability, contracts that the creditor shall receive valid payment of his claim against the principal debtor. If there is no valid payment the contract of the surety remains unfulfilled, and the surety is not discharged, because what he contracted should be done has not been done. A payment which at the time it is made contains the seeds' of avoidance and is subsequently avoided, is not a valid payment, and hence does not operate to release the surety. And is not that precisely the condition of the case at bar ?

Now, all pretence of a payment in money being eliminated, there are two reasons why there was no payment made at all: First, there was no payment, because if the note *and* the mortgage were both intended by the parties to the transaction to constitute payment and a part of the agreed medium of payment, the mortgage, has failed to be available by reason of inherent infirmities; then the bank did not get the security it contracted to get, and it obviously cannot be treated as holding towards the surety the relation that it would have been forced to assume had it secured what it contracted for and what Wilcoxon undertook to give it. And secondly, because there is no pretence that the bank agreed to rely solely on the *note* of Wilcoxon and wife as in itself a payment of the antecedent indebtedness.

The law is perfectly well settled in this State that the mere receipt of a security of equal or inferior degree to that evidencing the original debt, will never operate as a payment of the latter.  There must be, in addition, proof that the new bill or note was accepted by the creditor under an agreement that he would run the risk of its being paid, and would look exclusively to it for satisfaction.   *Md. & N. Y. Coal Co.* v. *Wingert,* 8 Gill, 171 ;  *Hoopes* v. *Strasberger,* 37 Md. 390.   And the burden of proving such an agreement is on the party asserting it ; the presumptions are all against its existence.   *Haines & Epply* v. *Pearce, supra.*   There is not the most indistinct shadow of evidence, nor is it even pretended, that the bank took the note of Wilcoxon and wife under an agreement, either express or implied, to run the risk of its payment, or to look to it alone, apart from the mortgage, in settlement of the promissory notes or either of them.   Consequently, there is wanting one of the essential requisites to show a payment by the *note* alone.   Even if the note, separated from the mortgage, continues to have any validity, it could not be treated as a payment, because there is no evidence whatever that it was agreed to be so considered or treated.

But beyond this, when the mortgage fell the note fell with it.   The note of Wilcoxon and wife was but a part of the transaction, and a very subordinate and wholly unnecessary part, and was never intended to stand alone or severed from the mortgage.   It was the accidental and not the essential feature of the arrangement ; and to hold that it survived the wreck of the mortgage and constitutes by itself a payment of the note sued on, is to make the accessory serve the purpose designed originally to be accomplished by the principal—is to convert the subsidiary into the substantial term of the contract of novation or payment.   Such a conclusion would hold the wife absolutely bound on the note though she signed it on the condition that it was to be secured by a mortgage on her husband's property.   Being a mere surety herself, as all the facts incontestably show,

she was entitled to the benefit of all the securities held by the creditor, and it may well be questioned whether she could be held liable at all on the note, even if it did not fall with the mortgage, if she signed it and the bank accepted it upon the express condition that it was to be secured by a mortgage which afterwards turned out to be invalid. The very condition upon which the delivery and acceptance of the note depended failed; that is to say, the mortgage which was to secure it was inoperative; and the condition failing, the note was no longer enforcible, and not being enforcible it was utterly without value in the hands of the bank and consequently inoperative as a payment at all.

I think there was no error in the first and second exceptions, of which the appellant can complain. The production of the note sued on and the signatures to which were undisputed, made out the plaintiff's case; there was no evidence adduced tending to show payment, and the plaintiff was not required to prove the negative of the defendant's plea. Hence the proposed evidence which only tended to prove that negative was immaterial.

There was error, it seems to me, in rejecting the plaintiff's and in granting the defendant's prayers. The latter, besides being wrong in principle was entirely too general, and if for no other reason ought to have been rejected on that account. In my opinion the *pro forma* judgment ought to be reversed and judgment ought to be entered for the appellant.

●(Filed June 19th, 1895.)